# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 23, 2008

## STATE OF TENNESSEE v. ALEX L. VANCE

**Appeal from the Circuit Court for Warren County**
**No. F-10583     Larry B. Stanley, Judge**

---

**No. M2007-01083-CCA-R3-CD - Filed March 11, 2008**

---

The Defendant, Alex L. Vance, pled guilty to reckless aggravated assault,[1] a Class D felony, and reckless endangerment, a Class A misdemeanor. Sentencing was left to the discretion of the trial court. The trial court sentenced him to three years for the felony conviction and ordered that he serve four months in the county jail, with the remainder to be served on probation. He was also sentenced to a concurrent term of eleven months and twenty-nine days for the misdemeanor offense. On appeal, the Defendant argues that the trial court erred by denying his request for judicial diversion and by ordering a sentence of split confinement rather than full probation. Following our review, we affirm the sentences imposed by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Robert W. Newman, McMinnville, Tennessee, for the appellant, Alex L. Vance.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; and Lisa Zavogiannis, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

There is no transcript of the Defendant's guilty plea submission hearing in the appellate record. Consequently, we can only rely on the testimony presented at the Defendant's sentencing hearing and the information contained in his presentence report in order to summarize the factual background for his case.

---

[1] See Tenn. Code Ann. § 39-13-102(a)(2)(A).

A grand jury originally returned a ten-count indictment against the Defendant, and every charged offense arose from a January 4, 2006 incident in Warren County in which the Defendant wrecked his truck while driving with four passengers at a high rate of speed. No other vehicles were involved in the wreck. In exchange for his two guilty pleas, the remaining eight charges were dismissed. The Defendant was twenty-four years old at the time of the incident.

At the Defendant's sentencing hearing, Jennifer Craighead of the Tennessee Department of Probation and Parole testified that she prepared a presentence report for the Defendant. Prior to the January 4, 2006 wreck, the Defendant's criminal record consisted of four speeding violations. His average rate of speed above the posted speed limit for those four violations was nineteen miles per hour. On one of those occasions, the Defendant was cited for driving seventy-one miles per hour in a forty-five miles-per-hour zone.

Trooper Marty Terry of the Tennessee Highway Patrol testified that the wreck occurred at approximately 9:00 p.m., and he arrived on the scene shortly thereafter. He described it as "one of the worst wrecks" he had ever seen. One bottle of whiskey and a beer bottle were discovered inside the wrecked truck. Another bottle of whiskey was found under the rear portion of the truck. The Defendant had the odor of alcohol about him, and he vacillated between being "calm" and "hysterical"; he was concerned that the passengers had been hurt.

Trooper Terry testified that the Defendant and all four passengers were injured: two females who had been riding with the Defendant were transported by helicopter to a hospital in Chattanooga, and two male passengers[2] were taken by ambulance to another hospital. The Defendant received "a substantial lick to the head," but he was not transported by emergency services; rather, another trooper took him to a hospital for a blood test.[3]

Kelly Campbell testified for the State. Her daughter, Ashley Campbell, who was sixteen years old at the time, was one of the victims injured in the wreck. Mrs. Campbell described what occurred when she arrived at the hospital as follows:

> It was a long time before they would tell me what was wrong. They lied to me, and I knew it. It was a long time. It was like two a.m. before I finally got to see her. They wouldn't let me go see her. A doctor met with her father and I and said that she had a head injury and her brain was bleeding. That is when they told me about all the other injuries. . . . Her lungs were bruised. Her hip was dislocated. She

---

[2] Trooper Terry's testimony indicated that there were two male passengers and two female passengers in the truck. However, later in the hearing one of the male passengers, Justin Grissom, testified that he and three female passengers were the four people in the truck with the Defendant. In any event, it is clear that two female passengers were very seriously injured and transported by helicopter to a hospital and that the remaining two passengers were carried away from the scene in ambulances.

[3] During cross-examination, the Defendant admitted that approximately two hours after the accident, his blood alcohol level registered .06 percent.

-2-

was just cut all to pieces. The worst was the head injury. Her brain was bleeding. They showed me the CAT scan.

Her daughter stayed in the hospital for one week and began "neurological therapy" as soon as she returned home. Mrs. Campbell had to quit her job so she could stay at home and take care of Ashley,[4] who was mostly bedridden. Only after approximately ten weeks of therapy could Ashley walk without the assistance of a walker or crutches. According to Mrs. Campbell, she was "like a baby. She couldn't do anything."

Regarding the long-term effects of Ashley's injuries, Mrs. Campbell testified that she continued to suffer from memory loss and was "struggling with learning." She also described her daughter as "anti-social" and "just different" because of the brain injury. Asked how her daughter's condition had affected her, Mrs. Campbell explained that she and her husband had divorced because of the financial strain resulting from her daughter's medical bills and that "[e]verything that [they] had planned for [her daughter was] destroyed."

Mrs. Tammy Seals testified that her daughter, Amelia Hurd, was the other young woman seriously injured in the wreck. Amelia was also sixteen years old on the night of the incident. After Mrs. Seals arrived at the hospital, a doctor told her that Amelia "would not be able to ever walk again." Her entire mid-pelvis region was crushed in the wreck, and she had to stay in the hospital for over a month. While there, Amelia underwent several surgeries that lasted as long as seventeen hours. She was "in restraints" and had to stay in the same position for two weeks without moving. During that time, Mrs. Seals had to take care of Amelia "just like a baby."

When Amelia was released from the hospital, she had to go to a rehabilitation center for three weeks before she could return home and continue her therapy. It was approximately six months after the wreck before Amelia could attempt to stand, and eventually, she did walk again but will always have a limp. She had to endure "a lot" of pain during the process of learning to walk again. According to her doctors, Amelia will suffer from arthritis that will begin at an early age and affect her for the rest of her life, and there is a possibility that she will later be confined to a wheelchair.

Mrs. Seals had to quit her job so that she could take care of Amelia full time and homeschool her so that she would not fall too far behind in her studies. She was able to eventually return to regular school, but Mrs. Seals informed that she just goes to school and comes home and that she does not "get out or anything as much anymore." Mrs. Seals described Amelia as being "outgoing" before the wreck and testified that Amelia formerly enjoyed riding horses and four wheelers, as well as going swimming.

---

[4] To avoid confusion, we employ the first names of the two young women who were seriously injured in the wreck. We intend no disrespect by so doing.

Several character witnesses testified on the Defendant's behalf. Donnie Evans, the former Sheriff of Van Buren County, and Barney Evans, the current Sheriff of Van Buren County, both testified that they had known the Defendant for many years and opined that he was a good candidate for probation because he would abide by all the conditions attendant thereto. Three of the Defendant's former employers testified that he was hard working, reliable and honest. The Defendant's second cousin, an uncle, a neighbor, and a former teacher all testified to the Defendant's good character and encouraged a probationary sentence. His father testified that the Defendant was "as kind hearted as they come" and had been extremely regretful since the wreck. The State stipulated that another seven witnesses slated to testify on behalf the Defendant would all account for his sound character.

Justin Grissom testified that he was injured in the wreck. Earlier that night, he had talked to three young women he knew (which included Amelia Hurd and Ashley Campbell), and they planned to go racoon hunting. Grissom picked the three girls up in his vehicle at a store in Spencer where they were waiting for him. At that time, the three girls possessed one bottle (a "fifth") of whiskey. He did not know how they obtained the liquor.

The foursome came upon the Defendant by happenstance and decided to ride with him to McMinnville in order to have dinner at a McDonald's restaurant. The wreck occurred on their way back to Spencer. Grissom confirmed that the girls brought their bottle of liquor with them into the Defendant's truck, but he testified that he did not know to whom the other bottle of whiskey belonged. Grissom thought the Defendant should receive probation because "accidents happen, man."

The Defendant testified that he was remorseful and that he would comply with the conditions of probation. On cross-examination, he admitted that he had consumed "probably two or three or four" beers before he picked up the passengers on the night of the incident, but he maintained that he did not drink any alcohol after he picked them up. He also agreed that he had been driving "too fast." When asked whether he could have been driving 103 miles per hour, he said, "I don't know." He denied ownership of either bottle of whiskey recovered from his truck, saying that the passengers "must have brought it with them." He asserted he never saw the liquor.

At the close of the hearing, the trial court sentenced the Defendant to eleven months and twenty-nine days for the misdemeanor conviction and to three years for the felony conviction. The trial court also denied full probation, ruling as follows:

> I did consider all of the testimony of the mothers of the victims today, as well as the other witnesses who have testified. I have considered all of the guidelines in the sentencing act. I have considered all the reasons, and [defense counsel] has pointed out several of them, the types of sentences to be given. I have considered the intent of the sentencing guidelines. I have considered the mitigating factors and the enhancement factors. The mitigating factors, I don't put much weight to the fact that the [D]efendant used a lack of judgment. He is old enough to know what was going

on. I do not find that he committed the offense under such unusual circumstances that it is unlikely that it was [his] intent to violate the law and engage in criminal conduct. However, I would modify the word intent to say that he engaged in extremely reckless conduct, although I don't believe this boy intented to hurt anybody. He did engage in reckless conduct. I have considered his work ethic, and evidently while I don't give any one person more leeway over another because of who their family is and what they make, or if they are well known and so forth, it is relevant that he has a good work ethic, and there is absolutely no proof to dispute that. . . .

As I said previously, I have considered the pre-sentencing report, the facts of the circumstances surrounding this offense, the nature and conduct, and any prior criminal history. In this case, there were four (4) guilty pleas to speeding at fairly excessive speeds. Previous actions and character of the [D]efendant, most of which are good to his credit, except for driving skills. Whether or not the [D]efendant might be rehabilitated, including a period of probation or split confinement, and whether the [D]efendant would commit another crime. Whether it would appear that the [D]efendant would abide by the terms of probation. Whether or not the interest of society is protected. The probability of future criminal conduct, whether that interest is great for society. Whether the sentence of probation would depreciate the seriousness of these offenses. Whether confinement is particularly suited to deter others to commit such offenses. Whether or not the offense was particularly gross . . . I have weighed all of those facts. . . . Situations like this occur all the time. They happened when I was growing up, and they happened before I got to high school. They happened when I was in high school. They happened after I left high school. They happened while you were in school and after you left. Contrary to a statement made by one of the witnesses, "Man, accidents happen;" but you know what? A whole lot less of accidents would happen, and a whole lot less of people would get hurt if you don't drive at an excessive speed after you have been drinking. That is a fact. We as a society can take notice that we have seen too many kids maimed and killed over the years by excessive speed and alcohol. These girls were in a place they shouldn't have been, but nobody made [the Defendant] drive that fast after [he] had been drinking. That was [his] choice. I have considered all of this in setting the sentence. I find that the [D]efendant should serve a period of (4) months in the Warren County Jail with the balance to be on probation. . . .

For the record, I hope this serves as a [reminder] to the other sixteen (16) and seventeen (17) and eighteen (18) year olds out there who want to drink and drive fast that people are going to get hurt, and people are going to go to jail.

The trial court then stated that it had also considered granting judicial diversion, but "for the same reasons[,]" denied the request. It is from the sentences imposed that the Defendant appeals.

**Analysis**

**I.      Notice of appeal**

Initially, we will address the State's argument that the Defendant's notice of appeal was untimely. The State contends that the notice was late because the sentence was announced on March 28, 2007 at the sentencing hearing, and the notice of appeal was filed more than thirty days later, on May 8, 2007. However, the Defendant's judgments of conviction were not filed until April 27, 2007. We conclude that the notice of appeal was timely. See Tenn. R. App. P. 4(a) (mandating that a notice of appeal to this Court shall be filed "within 30 days after the date of entry of the judgment appealed from . . . .") (emphasis added).

**II.      Guilty plea submission hearing transcript**

Next, we will review the State's argument that this Court must affirm the Defendant's sentence because no transcript of the Defendant's guilty plea submission hearing is included in the record on appeal.

This Court has noted in previous opinions that when the record on appeal does not contain a transcript of a defendant's guilty plea submission hearing, effective review of a sentence imposed may be impossible. See e.g., State v. Robinson, 139 S.W.3d 661, 664 (Tenn. Crim. App. 2004); State v. Keen, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999). In Robinson, this Court explained the need for a transcript of the guilty plea submission hearing and the effect of its absence as follows:

> The transcript of the guilty plea is usually necessary in order for this court to ascertain the facts and circumstances surrounding the offense. Indeed, the guilty plea hearing is the equivalent of a trial. In the absence of a transcript of a guilty plea, this court must generally conclude that the sentence imposed by the trial court was correct.

Robinson, 139 S.W.3d at 664–65 (citations omitted). However, as this Court did in Robinson and Keen, we conclude that the factual background developed at the Defendant's sentencing hearing is sufficient to allow appellate review of whether the sentences were proper. See Robinson, 139 S.W.3d at 664-65; Keen, 996 S.W.2d at 844–45.

**III.      Propriety of the sentences imposed**

The Defendant argues that the trial court erred by denying judicial diversion or a sentence of full probation. Specifically, he argues that the trial court did not consider appropriate factors in denying judicial diversion and, in the alternative, that the evidence presented at his sentencing hearing established that full probation was the most appropriate punishment for the Defendant. In support of these arguments, the Defendant relies on his criminal history (or lack thereof) and on the evidence of his sound character presented at the hearing.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the

principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

In the present case, it is evident from the appellate record that, prior to imposing the Defendant's sentence of split confinement, the trial court considered Tennessee's sentencing principles and other relevant considerations set out above. Accordingly, the presumption of correctness regarding the trial court's sentencing determinations applies in this appeal. See Ashby, 823 S.W.2d at 169. We conclude that the trial court's denial of judicial diversion and full probation was not error.

A defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). The following considerations provide guidance regarding what constitutes "evidence to the contrary":

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1); see also State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000).

Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(2), (4). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. Tenn. Code Ann. § 40-35-103(5). In this case, we point out that the Defendant did receive an alternative sentencing option; that is, he received a sentence of split confinement rather than total incarceration.

### A.    Judicial diversion

A defendant may be granted judicial diversion when he or she is found or pleads guilty to a Class C, D, or E felony, has not previously been convicted of a felony or Class A misdemeanor, and is not being sentenced for certain sex offenses. Tenn. Code Ann. § 40-35-313(a)(1)(B). However, eligible defendants are not automatically entitled to judicial diversion. See State v. Harris, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996). The decision of whether to grant judicial diversion rests within the sound discretion of the trial court, and this Court will find an abuse of that discretion only if there is no substantial evidence supporting the denial of judicial diversion. See Robinson, 139 S.W.3d at 665 (citing State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997)).

The offenses committed by the Defendant in this case were indeed serious: because of the Defendant's reckless act of consuming alcohol and then driving with four passengers at a high rate of speed, two sixteen-year-old girls received extremely severe injuries that will substantially and negatively impact the remainder of their lives and those of their families. Moreover, the Defendant had a history of speeding violations prior to committing the instant offenses. Based on the presence of these factors supporting the trial court's decision, we must conclude that the trial court did not abuse its discretion in denying the Defendant judicial diversion. See Robinson, 139 S.W.3d at 665; see also Tenn. Code Ann. § 40-35-103(1)(B).

Further, the Defendant's argument that the trial court did not discuss any relevant statutory factors in denying judicial diversion is not supported by the record before this Court. As set out

above, the trial court explained at length each of the sentencing factors and considerations it considered in denying full probation. The trial judge stated that he denied diversion based upon the same factors and considerations.

### B.    Full probation

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. See Tenn. Code Ann. § 40-35-303(a). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. See Tenn. Code Ann. § 40-35-303(b). No criminal defendant is automatically entitled to probation as a matter of law. See Tenn. Code Ann. § 40-35-303(b), Sentencing Commission Comments; State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. See State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

In determining whether to grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, both physical and mental; the deterrent effect on the defendant; and the defendant's potential for rehabilitation or treatment. See id. If the court determines that a period of probation is appropriate, it shall sentence the defendant to a specific sentence but then suspend that sentence and place the defendant on supervised or unsupervised probation either immediately or after the service of a period of confinement. See Tenn. Code Ann. §§ 40-35-303(c), -306(a).

A defendant who is eligible for probation, as the Defendant is in this case, bears the burden of proving his or her suitability for full probation. See Tenn. Code Ann. § 40-35-303(b). In this case, it is apparent from the record that the trial court based the denial of full probation primarily upon the nature and circumstances of the offense and the deterrent effect such a denial would have on others likely to commit a similar offense. In order for probation to be properly denied based solely on the nature of the offense, the criminal act, as committed, must be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree." State v. Cleavor, 691 S.W.2d 541, 543 (Tenn. 1985). Otherwise stated, the nature of the offense must outweigh all factors favoring full probation. Id.

The trial court in this case found that the facts underlying the Defendant's crime were sufficient to justify a denial of full probation based upon this standard. The trial judge also relied on the Defendant's prior history of speeding offenses. We conclude that the record before this Court—which adequately illustrates the seriousness of the Defendant's offenses—supports and justifies the trial court's denial of full probation. The Defendant's criminal act, drinking and then driving four young passengers at a high rate of speed which resulted in a horrific and injurious single-car accident, was reckless to an excessive and exaggerated degree.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the sentences imposed by the trial court.

 

 

_____

DAVID H. WELLES, JUDGE